UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                                    Plaintiff,          No. 05-CV-6482CJS(MWP)

        -vs-
                                                        DECISION AND ORDER

NICHOLS GAS & OIL, INC. and
TOWNSEND OIL CORPORATION
d/b/a TOWNSEND OIL & PROPANE,

                                    Defendants.
_____

APPEARANCES

For Plaintiff:          Sunu P. Chandy, Esq.
                        U.S. Equal Employment Opportunity Commission
                        New York District Office
                        33 Whitehall Street, 5th Floor
                        New York, New York 10004

For Defendant
Townsend Oil Corp.:     James S. Wolford, Esq.
                        Wolford Law Firm LLP
                        16 East Main Street
                        600 Reynolds Arcade Building
                        Rochester, New York 14614

INTRODUCTION

        This is an action alleging employment discrimination pursuant to Title VII of the

Civil Rights Act of 1964 ("Title VII), as amended, 42 U.S.C. § 2000e *et seq.*  Now before

the Court are two motions: 1) a motion [#79] for summary judgment by defendant

Townsend Oil Corporation d/b/a Townsend Oil & Propane ("Townsend"); and 2) a cross-

motion [#87]  for summary judgment by Plaintiff.    For the reasons that follow, both

applications are granted in part and denied in part.

1

BACKGROUND

The subject motions seek a determination as to whether Townsend is subject to successor liability for employment discrimination allegedly committed by defendant Nichols Gas & Oil, Inc. ("Nichols"). Unless otherwise noted, the following are the undisputed facts of this case.

On September 12, 2003, Elisa Foss ("Foss"), a former employee of Nichols, filed a sexual discrimination complaint with the Equal Employment Opportunity Commission ("Plaintiff"). Foss alleged that Nichols' President/Owner, Wayne Nichols ("Mr. Nichols"), subjected her to "unwelcome comments and touching of a sexual nature," and constructively discharged her. (Docket No. [#6], Exhibit A). On June 9, 2005, the EEOC determined that there was sufficient cause to find that Mr. Nichols had subjected Foss and several other female employees to "egregious physical and verbal sexual harassment [and retaliation] which compelled many of them to resign." (*Id*., Exhibit D). Also on June 9, 2005, the EEOC proposed a conciliation agreement that would have required Nichols to take various action, including: 1) Providing sexual harassment training for employees and supervisors; 2) paying the affected women back pay plus interest; and 3) paying each of the affected women "up to $50,000.00 or the maximum allowable by federal statute in compensatory damages." (*Id*., Exhibit E).

On June 30, 2005, EEOC provided additional information to Nichols regarding the complaints of discrimination by Foss and "at least ten additional" female employees.

(*Id.*, Exhibit G).[1]   EEOC informed Nichols that it would settle all claims for $575,500.00.

(*Id.*).  Plaintiff has since reduced its total demand to $550,000.00.[2]

On September 14, 2005, Plaintiff EEOC commenced the subject Title VII action against Nichols.  The action, brought on behalf of Foss and the other similarly situated females, none of whom were still employed by Nichols, alleged a hostile work environment, retaliation, and constructive discharge.  The Complaint alleged that Nichols, "through its owner," Mr. Nichols, "and some of its male employees," committed the discriminatory acts.  The complaint demanded injunctive relief, as well as compensatory and punitive damages.

Subsequently, on or about November 30, 2005, Nichols entered into a "Purchase Agreement" with defendant Townsend.  In a prior Decision and Order in this case, the Honorable Marian W. Payson, United States Magistrate Judge, described the Purchase Agreement as follows:

> The Agreement was signed by Kevin Brady [("Brady")], as President of Townsend, and Wayne Nichols, in his individual capacity and as President of Nichols Gas & Oil, Inc.  The Agreement provided that Townsend would purchase certain specified assets of Nichols, including its tanks, certain trucks and any inventory and supplies selected by Townsend the day before the closing, as well as Nichol's real property.  The Agreement further provided that (1) Townsend would have the exclusive right to use the name "Nichols Gas & Oil," (2) Nichols would execute an agreement not to compete with Townsend's business for a period of five years following the sale and deliver its customer list to Townsend, and (3) the parties

---

[1] EEOC alleged, in relevant part, that Mr. Nichols regularly asked female employees questions about their sex lives, requested sexual favors, referred to female employees as 'bitches,' made comments about female employees' bodies, asked female employees to sit on his lap, and touched female employees by hugging them and rubbing their shoulders. (*Id.*, Exhibit G).

[2] At oral argument, Plaintiff's counsel stated that the figure represents fifty thousand dollars in total back pay, and fifty thousand dollars combined compensatory and punitive damages for each of the ten women who were allegedly harassed.

would execute agreements providing for Wayne Nichol's continued employment and his wife's consulting services after the sale.

A schedule[, Schedule 6.10,] was attached to the Agreement identifying pending or threatened lawsuits, claims and investigations. This action was the only item disclosed on that schedule and was identified as follows: Elisa Foss v. Nichols Gas & Oil, Co.[,] Charge No. 165-2003-00767[,] Date of Filing of EEOC Charge: Sept. 12, 2003[,] Date of Probable Cause Determination: June 9, 2005[,] Complaint filed in United States District Court, Western District of New York on September 14, 2005, Docket No. 06:05-CV-06482-CJS(P).

(Decision and Order [#40] at 5) (citations omitted). As part of the agreement, Nichols Gas & Oil and Mr. Nichols agreed to indemnify Townsend for any claims brought against Townsend arising from the EEOC Complaint. (Chandy Declaration [#86], Exhibit B at 9). Nichols further agreed to amend its certificate of incorporation with the State of New York, "changing its name to a name dissimilar to 'Nichols Gas & Oil' to enable [Townsend] to use that name." *Id*. at 10.

Townsend's President, Brady, learned of the EEOC charge and pending lawsuit prior to the closing. (Brady Deposition at 37-38). Brady also learned that there had been television news coverage of the sexual harassment lawsuit against Nichols. *Id*. at 38, 96. Brady, though, did not take any steps at that time to investigate the allegations against Nichols. *Id*. at 40. In fact, Brady claims that he did not learn any of the details of the allegations against Nichols until January 2007. *Id*. at 43. Brady testified, though, that he had misgivings about the closing, but went ahead anyway:

Q. But you continued with the purchase? . . . Was that based on financial considerations or some other reason?

A. It was based on my desire. I've been trying to get into that market for several years. I think I was blinded. I felt that we were indemnified, and not even knowing the background of all of this, the EEOC, obviously, it was

4

a big mistake.

*Id.* at 100.

Having decided to proceed with the deal, Brady claims to have decided that Townsend should distance itself from Nichols, and that "there was no value to [the] Nichols Gas & Oil [name]." *Id.* at 40. Brady considered scrapping the deal, but decided instead to "change completely the structure of the sale." *Id.* at 41. As to that, Brady testified:

> We no longer were gonna purchase the company in its entirety. Okay. We were not interested in the name, and we were very concerned about the value now of the customer list. We expected a lot of attrition.
>
> So the structure of the deal changed completely. As opposed to purchasing it on a whole value, we now saw the customer list as a – we structured the deal on a retained gallonage basis, meaning – which is common within the industry – meaning that we wouldn't pay any consideration for those until – as future sales took place.

*Id.*[3] Nevertheless, Townsend still essentially purchased the name and all assets of Nichols, except for eight-to-ten vehicles, some office furniture, some computers, certain inventory, and certain accounts receivable. However, while Townsend purchased the rights to the Nichols Gas & Oil name, it did not use the name, but instead, changed the name of the facility to Townsend Oil on or about December 1, 2005. (Brady Deposition at 162).

Following the closing, Townsend sent out a letter to Nichols' customers, that was signed by both Mr. Nichols and Brady. The letter stated four separate times that Townsend and Nichols had "merged," though Brady now denies that an actual merger

---

[3]It is unclear why Brady would have completely restructured the sale if in fact he did not learn any of the details of the allegations against Mr. Nichols until January 2007, as he claims.

took place. (*See*, Chandy Declaration [#86] , Exhibit C) ("We are pleased to announce that Nichols Gas & Oil, Inc. of Macedon, NY has completed a merger with Townsend Oil Corp. of LeRoy, NY."). The joint letter further stated that deliveries and service from the Nichols facility would continue as before, and that customers would be "able to call in and talk to the same individuals you are accustomed to on a local basis." *Id*. Further, the letter stated that "there are no planned changes in personnel at the Nichols facility." *Id*. In that regard, Townsend continued to employ all of Nichols' employees for some time following the closing. With regard to Mr. Nichols, the agreement provided that he would remain employed by Townsend for a period of five years, though he actually continued to work in sales and customer service for Townsend only until November 2006.

Townsend made certain changes at the Nichols facility, however. Specifically, Townsend removed Nichols' computer system, mechanic's shop, two-way radios, copier, and office furniture, and purchased new trucks, phone systems, a computer network, and office furniture. Townsend also established a system for having an employee "on call" twenty-four hours a day.

Approximately one month after the closing, Brady received a telephone message from a woman claiming to be a former customer of Nichols. She alleged that Mr. Nichols had solicited sex from her, in exchange for a debt that she owed him. (Brady Deposition at 8). Apparently, the incident was alleged to have occurred prior to the closing. Brady shared the message with certain managers at Townsend, but did not discuss the matter with Mr. Nichols, who was then employed by Townsend, nor did he take any other action. *Id*. at 10-11.

As for the corporation that was previously known as Nichols Gas & Oil, Inc., following the sale of assets to Townsend, Mr. Nichols changed the name of the corporation to "J.N.-IV, Inc." ("J.N.-IV").  J.N.-IV had three employees: Mr. Nichols, his wife, Theresa Nichols ("Mrs. Nichols"), and their daughter, Jessica Nichols.  J.N.-IV existed primarily to collect accounts receivable owed to Nichols prior to the sale. (Wayne Nichols Deposition at 271-272).

It is undisputed that as a result of the sale, Mr. Nichols, Mrs. Nichols, and/or J.N.-IV, received approximately $1.5 million from Townsend.  However, it is also undisputed, at least in the current record, that as of August 2008, J.N.-IV claimed to have assets valued at only approximately one-thousand dollars.

As mentioned earlier, Plaintiff initially commenced this action solely against Nichols Gas & Oil.  Upon learning through discovery of the sale to Townsend, Plaintiff moved to amend the complaint to add Townsend as a defendant, on the basis of successor liability.  Townsend opposed the application, on the ground of futility.  In that regard, Townsend argued that under general principles of common law, it was not subject to successor liability.  However, as will be discussed further below, Magistrate Judge Payson granted the motion to amend, finding that Plaintiff had stated a claim for successor liability under the "substantial continuity" test, as discussed in *Forde v. Kee Lox Mfg. Co., Inc.*, 584 F.2d 4, 5-6 (2d Cir. 1978) (Title VII case).  Defendants did not file objections to Judge Payson's decision.

Subsequently, as part of discovery in this action, Plaintiff and Townsend deposed Mrs. Nichols, who had personal knowledge regarding the finances of Nichols and J.N.-IV, gained from maintaining the bank accounts for the corporations. (Mrs. Nichols's

7

Deposition at 54-55). Mrs. Nichols testified that at closing, Nichols/J.N.-IV was shown as receiving $548,916.55 from Townsend, representing pre-paid deposits from customers, which the parties had agreed that Nichols would keep. *Id*. at 61-62, 74. She stated, though, that Nichols did not actually receive any cash from Townsend at closing (*Id*. at 72), and that Nichols/J.N.-IV did not necessarily actually have $548,916.55 at that time. *Id*. at 74.[4] Mrs. Nichols further stated that she did not know how much money Nichols/J.N.-IV actually had at that time, because she did not have the necessary records with her at the deposition. *Id*. at 66. It does not appear that Plaintiff or Townsend obtained any additional discovery from Mrs. Nichols on that point. Mrs. Nichols also indicated that as of February 2006, Nichols/J.N.-IV received $294,545.24 from Townsend, representing accounts receivable that Townsend collected for Nichols following the closing. *Id*. at 63. Moreover, Nichols/J.N.-IV had additional accounts receivable of $399,187.11, although there is no indication as to how much, if any, of that amount was ever collected.

    To summarize Nichols/J.N.-IV's financial condition at or around the time of the sale to Townsend, Mrs. Nichols' testimony showed the following: 1) during the two months prior to closing, Nichols received $548,916.55 in pre-paid customer deposits, which it retained at part of the sale; 2) Nichols received an additional $294,545.24 from Townsend following the closing, as and for accounts receivable owed to Nichols prior to closing; and 3) Nichols had the right to collect and keep $399,187.11 in additional

---

    [4]*See also*, Brady Deposition at 67-68 (Stating that Townsend did not actually pay Nichols the $548,916.55 shown on the closing statement). According to Brady, that amount represented deposits that Nichols collected from customers during the two months leading up to the closing. *Id*. at 66.

accounts receivable, though there is no indication as to how much of that amount was ever collected.[5]

As for Nichols/J.N.-IV's financial condition in 2008, Mrs. Nichols stated that the corporation essentially had no assets, since all of the money had been "eaten up" by legal bills. *Id*. at 61. Mrs. Nichols further stated that Nichols/J.N.-IV owed herself and Mr. Nichols $256,281.00, because they had loaned Nichols/ J.N.-IV sums of money from their personal assets over a period of years, for which they had not been repaid. *Id*. at 60, 76.   Overall, Mrs. Nichols testified that as of August 2008, Nichols/J.N.-IV had essentially no assets, and debts of $255,001.00. *Id*. at 77, 79.  There is no indication that Nichols/J.N.-IV's financial condition changed during the period between August 2008 and the date that the subject motions were filed.

Additionally, as of August 2008, Townsend had commenced a lawsuit against Nichols, J.N.-IV, and Mr. & Mrs. Nichols, for damages that they allegedly caused to Townsend. (Brady Deposition at 71).   The potential damages that Townsend is seeking in that action is unclear:

> Q. Is there a dollar figure in your mind to compensate Townsend Oil Corporation for that damage? [caused by Nichols/J.N.-IV and Mr. & Mrs. Nichols]
>
> A. It's an intangible.  I know one deal fell through.  I was in the process of buying another company and because they found out about this – it was worth over a million dollars.  I've lost a lot of business in affiliating with this individual [Mr. Nichols].  So what dollar do you put on that?  I don't know.

---

[5]Pursuant to the agreement with Townsend, Mr. & Mrs. Nichols were also personally paid $148,500.34 pursuant to their consulting agreements with Townsend, and Mr. Nichols was paid $72,000.00 in salary during the months that he was employed by Townsend. Id. at 64.  However, neither Mr. Nichols or Mrs. Nichols are parties to this action.

*Id.* at 71-72.

On May 22, 2009, Townsend filed its subject motion [#79] for summary judgment, seeking a determination that it has no successor liability for Nichols' alleged discrimination. Essentially, Townsend raises the same arguments that it made when opposing Plaintiff's motion to amend the complaint to add Townsend as a defendant. More specifically, Townsend maintains that: 1) the "substantial continuity" test does not apply in Title VII cases, due to recent decisions from the U.S. Supreme Court and the Second Circuit; 2) even if the substantial continuity test applies, Townsend is not liable as a successor, since it did not substantially continue Nichols' business operations, and since Nichols is able to provide relief to Plaintiff; and 3) even if Townsend has successor liability, such liability does not include liability for compensatory or punitive damages.

On August 13, 2009, Plaintiff filed its subject cross-motion [#87] for summary judgment. Plaintiff maintains that Townsend is subject to successor liability under the substantial continuity test, because it had notice of the pending action and substantially continued Nichols' business, and because Nichols is not financially able to provide relief to Plaintiff.

On December 3, 2009, counsel for Plaintiff and Townsend appeared before the undersigned for oral argument.

ANALYSIS

*Rule 56*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

10

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996). Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

*Successor Liability in Title VII Cases*

At the outset, the parties dispute the proper test for determining successor liability in a Title VII case. Townsend maintains that the Court should apply the general common-law test for successor liability, under which "a corporation that acquires the assets of another corporation is not liable for the torts of its predecessor," except in certain circumstances that are not applicable here. *See, Graham v. James*, 144 F.3d 229, 240 (2d Cir. 1998) ("Under both New York state and federal law, the general rule is that a corporation that acquires the assets of another corporation is not liable for the torts of its predecessor.") (citations omitted).

On the other hand, Plaintiff contends that the Court must apply the more-specialized substantial continuity test, which, Plaintiff maintains, is applicable in labor and discrimination law cases. Under this test, "the appropriateness of successor liability depends on whether the imposition of such liability would be equitable." *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 554 (6th Cir. 2006) (*citing EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1089-1091 (6th Cir. 1974) ("*MacMillan*")). In that regard,

> whether successor liability is equitable in a particular case requires courts to balance 1) the interests of the defendant-employer, 2) the interests of the plaintiff-employee, and 3) the goals of federal policy, in light of the particular facts of a case and the particular legal obligation at issue. . . . [T]here is, and can be, no single definition of 'successor' which is applicable in every legal context. Successor liability questions must be answered on a case by case basis, and a new employer may be a successor for some purposes and not for others.

*Id*. (citations and internal quotation marks omitted). The *MacMillan* case identified nine factors that a court may consider in determining whether the imposition of successor

liability would be equitable:

> (1) whether the successor company has notice of the charge; (2) the ability of the predecessor to provide relief; (3) whether the new employer uses the same plant; (4) whether there has been substantial continuity of business operations; (5) whether the new employer uses the same or substantially same workforce; (6) whether the new employer uses the same or substantially same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether [the defendant] uses the same machinery, equipment and methods of production; and (9) whether [the defendant] produces the same product.

*Id*. (citation omitted).  However, these factors

> are not in themselves the test for successor liability. Instead, the nine factors are simply factors courts have considered when applying the three prong balancing approach, considering the defendant's interests, the plaintiff's interests, and federal policy. . . . [A]ll nine factors will not be applicable to each case. Whether a particular factor is relevant depends on the legal obligation at issue in the case. The ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy.

*Id*.  In cases involving discrimination allegedly committed by a corporation's

predecessor, some courts have focused on three of the nine *MacMillan* factors: 1)

whether the successor company had notice of the EEOC charge; 2) the predecessor's

ability to provide relief to the Plaintiff; and 3) whether there was a substantial continuity

of business operations between the predecessor and successor. *See, EEOC v. Barney

Skanska Construction Co.*, No. 99 Civ. 2001 (DC), 2000 WL 1617008 (S.D.N.Y. Oct. 27,

2000).[6]

---

[6]At oral argument, the Court asked counsel to explain how the balancing of the *MacMillan* factors was to occur.  Specifically, the Court asked whether, assuming that the jury would decide any disputed issues of fact relating to the *MacMillan* factors, the jury would then also balance the factors, or whether the Court would balance the factors, based on the jury's factual determinations.  Subsequently, counsel for Plaintiff and Townsend submitted supplemental briefs addressing this issue.  Townsend's counsel maintains that since the substantial continuity doctrine is equitable in nature, the Court should resolve any factual issues and balance the factors. (Letter of James Wolford, Esq. dated December 9, 2009) ("[T] 'substantial conitinuity' doctrine is an equitable remedy derived solely from the equitable powers of the

Townsend, though, maintains that the "substantial continuity" test only applies to cases arising under the National Labor Relations Act ("NLRA"). As to this position, Townsend relies primarily on two decisions: *U.S. v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876 (1998) and *New York v. National Services Industries, Inc.*, 352 F.3d 682 (2d Cir. 2003). Both of these cases involve the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and hold that, in order for a federal statute to "abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." *See, e.g., Bestfoods*, 524 U.S. at 63, 118 S.Ct. at 1885 (citation omitted). In *National Services Industries*, the Second Circuit analyzed the *Bestfoods* decision, and concluded that in CERCLA cases, "the substantial continuity test is not a sufficiently well established part of the common law of corporate liability to satisfy *Bestfoods*' dictate that common law must govern." *National Services Industries*, 352 F.3d at 686. The Second Circuit noted, however, that "the substantial continuity doctrine is well established in the area of labor law." *Id.* (citation omitted).

In the instant case, the Court finds that the substantial continuity test applies to cases under Title VII, for two reasons. First, in connection with Plaintiff's motion to amend, Judge Payson issued a thoughtful decision which concluded that the substantial continuity test applies. (Decision and Order, Docket No. [#40] at 6-10). Consequently,

_____

federal courts. Accordingly, there is no issue for a jury to decide relating to the *MacMillan* factors."). Plaintiff's counsel maintains that it would be appropriate for a jury to decide any factual issues related to the *MacMillan* factors, and to also weigh the factors. However, Plaintiff's counsel agrees for purposes of this action that the Court may make all of the findings necessary to resolve the issue of successor liability. (Letter of Sunu Chandy, Esq. dated December 17, 2009) ("In light of the overall discussion at the hearing [oral argument] and given the apparent lack of binding legal authority in this Circuit on this question, EEOC is amenable to this Court weighing the equities and making a determination on successor liability. Even if the Court finds (contrary to the parties' views), that there are material facts in dispute, EEOC contends that any such disputes can be resolved on the papers submitted to the Court [.]") (citations omitted).

14

Judge Payson's ruling on that point is the "law of the case," from which this Court has been given no reason to depart. *See, North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995) ("[T]he law of the case should be disregarded only when the court has a clear conviction of error with respect to a point of law on which its previous decision was predicated.") (citation omitted). Second, even if Judge Payson's ruling were not law of the case, this Court would reach the same conclusion. In that regard, the Court notes, for example, that the Code of Federal Regulations ("CFR") recognizes that the substantial continuity test applies in Title VII cases. *See*, 29 C.F.R. § 825.107 (2009) (Stating that in Title VII cases, the nine *MacMillan* factors apply when determining successor liability); *accord, Cobb v. Contract Trans., Inc.*, 452 F.3d at 551.

Applying the relevant substantial continuity factors discussed above, the Court finds, at the outset, that Townsend clearly had notice of the EEOC charge and this lawsuit prior to purchasing Nichols' assets. Additionally, such notice caused Townsend to alter the purchase agreement. Specifically, Townsend decided that the Nichols company name and customer list were less valuable as a result of the EEOC complaint and lawsuit, and consequently structured the purchase price on a "retained gallonage" basis. The notice also resulted in the inclusion of an indemnification clause in the agreement, requiring Nichols to indemnify Townsend for any damages resulting from this lawsuit. Therefore, this factor weighs in favor of imposing successor liability on Townsend. *See, Golden State Bottling Co., Inc. v. National Labor Relations Bd.*, 414 U.S. 168, 185, 94 S.Ct. 414, 425 (1973) ("Since the successor must have notice before

15

liability can be imposed, his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices.") (citation and internal quotation marks omitted).

As for the next relevant factor, Townsend contends that it did not substantially continue Nichols's business. However, the Court finds, on the undisputed facts, that Townsend did substantially continue the Nichols Gas & Oil business. It is true that there were a few changes. For example, Mr. Nichols was moved from his supervisory position to that of a salesman, and a new manager was placed in control at the former Nichols facility. Additionally, Townsend changed the name of the company. Otherwise, though, Townsend used the same customer list, it sold the same products, it used the same facility and essentially the same equipment, and it employed substantially the same personnel performing the same jobs, for at least some period of time following the closing. On these facts, the Court finds, as a matter of law, that Townsend substantially continued the Nichols Gas & Oil business. This factor also weighs in favor of imposing successor liability on Townsend.

As for the third and last element mentioned above, Townsend contends that successor liability is unwarranted, since Nichols has the ability to provide monetary relief to Plaintiff, having received approximately $1.4 million for the sale of the business assets. In that regard, Townsend maintains that, when considering whether a predecessor is able to provide relief, a court must look at the predecessor's financial condition at the time the action was commenced. (Townsend Memo of Law [#80] at 24). *See, EEOC v. Barney Skanska Const. Co.*, 2000 WL 1617008 at *5 ("Nothing in the

16

record indicates that W.J. Barney was unable to provide relief to Blakey *at the time the EEOC commenced the underlying action* in September 1994.") (emphasis added). On the other hand, Plaintiff contends that the Court should consider that Nichols purportedly does not *presently* have the ability to provide relief to Plaintiff. Plaintiff also maintains that Nichols did not have the ability to provide relief at the time of the closing. (Plaintiff's Counter-Statement of Facts ¶ 49) ("At the time of Townsend's purchase of Nichols Gas, financial documents provided by Nichols Gas indicate that J.N.-IV held total assets valued at $527,596 and total liabilities valued at $448,302, resulting in insufficient assets to resolve this matter."). Accordingly, it is disputed whether Nichols had the ability to provide relief when this action was commenced, and undisputed that Nichols/J.N.-IV does not presently have the ability to provide relief.

As Judge Payson noted in her decision granting Plaintiff's motion to amend the Complaint, there is disagreement among courts regarding this issue of timing. *See, Finnerty v. Wireless Retail, Inc.*, 624 F.Supp.2d 642, 660 (2009) ("[T]here is an open question as to the relevant time period that should be examined when considering whether the predecessor is able to provide relief, at the time of the sale of assets or at the time of the successor motion.") (citing *EEOC v. Nichols Gas & Oil, Inc.*, 518 F.Supp.2d 505, 514 (W.D.N.Y. 2007) (Payson, J.). Here, after weighing the interests of the parties and the goals of Title VII, the Court concludes that the relevant time is the filing of the motion seeking a determination as to successor liability. Here, choosing the earlier date would essentially leave Plaintiff without a remedy and defeat the purposes of Title VII. On the other hand, choosing the later date will provide Plaintiff with a potential

remedy and uphold the purposes of Title VII, and Townsend may seek indemnification from Nichols for any damages that it may suffer. Since it is undisputed, for purposes of the subject motions, that Nichols/J.N.-IV was essentially insolvent at the time the subject motions were filed, the Court finds that Nichols does not have the ability to provide relief to Plaintiff. Therefore, this factor also weighs in favor of imposing successor liability on Townsend.

The Court must now consider whether such successor liability extends to compensatory and punitive damages. Townsend maintains that it cannot be liable for either type of damages, and that it can only be liable for equitable relief, since the doctrine of "substantial continuity" successor liability is an equitable doctrine. Townsend further argues that any award of punitive damages against it would not be equitable, since it is essentially an innocent third party, who happened to purchase most of Nichols's assets. Plaintiff, on the other hand, insists that Townsend may be held liable for compensatory and punitive damages, because "Title VII successor liability does not require any showing of wrong-doing." (Plaintiff's Memo of Law [#84] at 16). Plaintiff also argues that Townsend is "hardly an innocent entity involved in an arms-length asset purchase," because it was aware of the allegations against Nichols, and because Townsend continued to employ Nichols for almost a year. (*Id.*at n. 9).

First, the Court finds that Plaintiff's argument regarding Townsend's lack of innocence lacks merit. While it may be true that, prior to closing, Townsend had notice of the *allegations* against Nichols, which have yet to be proven, the fact that Townsend went ahead with the purchase of Nichols' assets does not mean that Townsend condoned discrimination. Importantly, none of the women who claim to have been

18

harassed by Mr. Nichols were still employed by Nichols at the time of the purchase. Moreover, although Plaintiff faults Townsend for hiring Mr. Nichols, there is no evidence that Mr. Nichols committed any acts of discrimination during the period of such employment, which lasted less than one year. In any event, any such acts would not be relevant to the claims being asserted in this case, all of which arose prior to Townsend entering the picture. Consequently, the Court views Townsend as an innocent purchaser.

The Court will now consider whether compensatory and/or punitive damages may be awarded against a successor-defendant in a Title VII action. In general, either type of damages may be awarded, depending upon the facts of a particular case. *See, e.g.*, *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 749 (7th Cir. 1985) ("Indeed, the nature and extent of [successor] liability is subject to no formula, but must be determined upon the facts and circumstances of each case.") (citation and internal quotation marks omitted); *E.E.O.C. v. Steven T. Cox, Inc.*, No. 3:99-1184, 2002 WL 32357095 at *7 (M.D.Tenn. Jul. 19,2002) ("Successor liability includes liability for punitive damages, so long as punitive damages would be appropriate.") (citing *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 748 (7th Cir.1994)). Consequently, the Court rejects Townsend's contention that equitable relief is the only form of relief that may be awarded against a successor employer under the "substantial continuity" doctrine.

Punitive damages "are generally imposed to punish the actual wrongdoer and to deter him from acting illegally again." *Musikiwamba v. ESSI, Inc.*, 760 F.2d at 749. The Court is aware of only a few reported cases dealing with the issue of punitive damages

in Title VII actions involving successor liability, and all of them indicate that such damages are not appropriate against an innocent successor. *See, Armstrong v. Lockheed Martin Beryllium Corp.*, 990 F.Supp. 1395, 1403 n. 9 (M.D.Fla. 1997) ("Under no circumstances can this court envision the imposition of punitive damages liability against an innocent successor. The conflicting interests of the parties and policies justifying successor liability and punitive damages all militate in favor of the successor company on such a claim."); *E.E.O.C. v. Steven T. Cox, Inc.*, 2002 WL 32357095 at *7 ("[A]lthough it may indeed be inappropriate to impose punitive damages on an innocent successor, STCI is not an innocent successor."). In this case, of course, the alleged actual wrongdoer is Nichols, so awarding punitive damages against Townsend would not serve the purpose of punitive damages. Nor would such an award against Townsend be equitable under the facts of this case. Consequently, Townsend's summary judgment motion is granted as to punitive damages.

On the other hand, it appears that compensatory damages may be appropriate in this case, depending upon the evidence that may be introduced at trial. *See, Armstrong v. Lockheed Martin Beryllium Corp.*, 990 F.Supp. at 1403 ("[G]iven that Title VII allows for an award of compensatory damages designed to make the employee whole, it appears correct to conclude that the successor's liability could include an amount for compensatory damages in addition to backpay.") (Noting, though, that "[i]t may be appropriate to limit such damages to the same time frame as backpay."). That is, based on the present record, the Court cannot say as a matter of law that such damages would not be appropriate against Townsend. Therefore, Plaintiff's claim for compensatory

damages may go forward.

CONCLUSION

For the reasons discussed above, the parties' motions are granted in part and denied in part. Townsend's summary judgment motion [#79] is granted as to Plaintiff's claim for punitive damages, but is otherwise denied. Plaintiff's cross-motion for summary judgment [#87] is denied to the extent that it seeks a ruling that Townsend may be held liable for punitive damages, but it otherwise granted.

SO ORDERED.

Dated: Rochester, New York
    January 13, 2010

ENTER:


/s/ Charles J. Siragusa_____
CHARLES J. SIRAGUSA
United States District Judge